

FILED

2021 Feb-24  PM 03:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **JOHN CHRISTOPHER COVEY,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | Case No.: **2:18-CV-01121-RDP** |
| | } | |
| **COLONIAL PIPELINE COMPANY, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

| | | |
|---|---|---|
| **HUGH GERALD DELAUGHDER, JR., et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| v. | } | Case No.: **2:19-CV-923-RDP** |
| | } | |
| **COLONIAL PIPELINE COMPANY, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

| | | |
|---|---|---|
| **BEVERLY KAY WILLINGHAM, Individually and as Administratrix of the Estate of ANTHONY LEE WILLINGHAM, deceased,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| v. | } | Case No.: **2:19-CV-01507-RDP** |
| | } | |
| **COLONIAL PIPELINE COMPANY, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

**MEMORANDUM OPINION**

This case is before the court on Defendant L.E. Bell Construction Company, Inc. ("L.E. Bell")'s Amended Motion to Disqualify Counsel and for Related Sanctions. (Doc. # 116-1). In that Motion, L.E. Bell seeks various forms of relief as a remedy for alleged ethical violations arising out of Glenda Cochran Associates, LLC ("Cochran")'s interactions with Steve Barker, a former employee of L.E. Bell. Specifically, L.E. Bell requests the court (1) disqualify Cochran from these proceedings; (2) bar all parties and counsel in these proceedings (other than L.E. Bell and its counsel) from contacting Barker; (3) require Cochran to provide the court with all documentation received from, concerning, or related to Barker; (4) grant L.E. Bell an award of fees and expenses incurred in prosecuting this Motion; and (5) award any other relief the court considers fair, just, practicable, and warranted. (Doc. # 116-1 at 50). That Motion (Doc. # 116-1) is due to be granted in part, denied in part. However, before discussing the merits of L.E. Bell's claims, it is first necessary to provide a brief overview of the relevant facts.

**I.      Background**

This consolidated case stems from the October 31, 2016, explosion at a Colonial Pipeline ("Colonial") work site in Helena, Alabama. (Doc. # 1). Three cases (that each involve the same set of operative facts) were filed in the Northern District of Alabama (Cases # 2:18-cv-01121-RDP; 2:19-CV-923-RDP; 2:19-CV-01507-RDP) and another three cases were filed in Alabama state court. (*See* Doc. # 64). Cochran served as plaintiff's counsel in only one of the suits, which was filed against Colonial and Superior Land Designs LLC. *Delaughder v. Colonial Pipeline Co.*, 19-cv-923 (N.D. Ala.). Cochran's only claims against L.E. Bell are worker's compensation claims, filed in a separate action than those referenced above. (Doc. # 119-2 at ¶ 8). Those claims were filed in state court and, as they were filed under state worker's compensation law, they do not depend on any finding of fault. (Doc. # 119-2 at ¶ 8).

On October 11, 2019, the federal cases were consolidated before the undersigned.[1] (Doc. # 64). After consolidation, counsel for plaintiffs in the various suits began coordinating the case, including the conduct of discovery. (Doc. # 68 at 2). Soon thereafter, counsel for L.E. Bell discovered that Cochran had "hired" Barker, L.E. Bell's former Safety Director and a former consultant for L.E. Bell with respect to this litigation, and provided him with a $5,000 retainer. (Doc. # 68 at 2). By the time L.E. Bell learned of the working relationship between Cochran and Barker, the two had met on three occasions and had spoken by phone for some 14 hours. (Doc. # 116-1 at 16). L.E. Bell then filed a Motion to Disqualify Glenda Cochran and Associates to prevent Cochran from playing any role in the consolidated federal action, as well as the corresponding state court cases, because of Barker's work with L.E. Bell's legal team in developing causation theories as to why the pipeline explosion occurred. (Doc. # 68). Although Cochran was not adverse to L.E. Bell in any suit other than the worker's compensation actions, and Barker's work on the causation theories implicated Colonial (not L.E. Bell), L.E. Bell was nevertheless concerned about Cochran learning of causation theories because those theories could be used to produce larger verdicts or settlements against L.E. Bell. (Doc. # 116-1 at 13). And, L.E. Bell was particularly concerned because it had an indemnity agreement with Colonial, under which L.E. Bell could be deemed liable for those larger verdicts and settlements in the absence of "gross negligence" by Colonial. [rephrased last sentence] (Doc. # 116-1 at 12-13).

With these concerns in mind, L.E. Bell's counsel asserted that Cochran violated the Alabama Rules of Professional Conduct ("Rules" or "Alabama Rules") by improperly paying a fact witness, by improperly contacting a person who worked with defense counsel and was

---

[1] The consolidation order (Doc. # 64) stated that this court and Judge Alvis, of the Shelby County Circuit Court, will work together to informally coordinate the parties' discovery efforts. (Doc. # 64). However, the cases in Shelby County Circuit Court have since been reassigned to Judge Corey Moore. Judge Moore has graciously agreed to continue to coordinate the parties' discovery efforts in the two courts.

associated with a represented party, and by continuing to represent a plaintiff despite an imputed conflict of interest. (Doc. # 68 at 2-3). In light of that Motion (Doc. # 68), the undersigned stayed the consolidated federal suits and ordered the parties to not contact Barker. (Doc. # 71). After the parties conducted limited discovery, the parties deposed Barker while under the supervision of the court. (Docs. # 73, 109). L.E. Bell's counsel then filed the Amended Motion to Disqualify Counsel and for Related Sanctions currently before the court. (Doc. # 116-1). This litigation generally, and the motion to disqualify specifically, has been delayed because of the effects of the COVID-19 pandemic.

Before discussing the legal merits of L.E. Bell's Amended Motion to Disqualify Counsel and for Related Sanctions (Doc. # 116-1), the court finds it necessary to address Barker's role as a consultant for L.E. Bell with respect to this litigation. L.E. Bell asserts that "Barker was a key member of L.E. Bell's Litigation team [where] he worked extensively … to develop several proximate causation theories." (Doc. # 116-1 at 12). Cochran claims that statement is "hyperbole" and that, at most, Barker worked in a limited consulting capacity for L.E. Bell to prepare factual information for the Occupational Health and Safety Administration ("OSHA") and the National Transportation Safety Board ("NTSB"). (Doc. # 119 at 7, 26). As is often the case, it appears to the court that the truth lies somewhere in between these two extreme positions. During his deposition, Barker explicitly denied being a "core member" of L.E. Bell's legal team. (Doc. # 116-15 at 185:24-186:3). But, Barker's consulting role with L.E. Bell was not as perfunctory as Cochran suggests. Not only did Barker work with L.E. Bell in gathering and analyzing facts later provided to OSHA and the NTSB, he also worked with L.E. Bell's legal counsel, employees of L.E. Bell, and outside consultants to develop theories of what caused the explosion and who might be legally responsible. (Doc. # 116-15 at 31-39). And, it is Cochran's exposure to these legal

theories that is the most ethically concerning.

## II.    Legal Standard

"Because a party is presumptively entitled to the counsel of his choice, that right may be overridden only if 'compelling reasons' exist." *In re BellSouth Corp.*, 334 F.3d 941, 961 (11th Cir. 2003). One compelling reason to deny a client counsel of its choice is counsel's violation of an applicable rule of professional conduct. *See Banque de Rive, S.A. v. Highland Beach Dev. Corp.*, 758 F.2d 559, 561 (11th Cir. 1985); *Miccosukee Tribe of Indians of Fla. v. Cypress*, 686 F. App'x 823, 825-26 (11th Cir. 2017); *McGriff v. Christie*, 477 F. App'x 673, 677-79 (11th Cir. 2012); *Herrmann v. GutterGuard, Inc.*, 199 F. App'x 745, 747, 755-57 (11th Cir. 2006).

"The party moving to disqualify counsel bears the burden of proving the grounds for disqualification." *In re BellSouth Corp.*, 334 F.3d at 961. "A disqualification order is a harsh sanction, often working substantial hardship on the client and should therefore be resorted to sparingly." *Herrmann*, 199 F. App'x at 752 (quoting *Norton v. Tallahassee Mem'l Hosp.*, 689 F.2d 938, 941 n.4 (11th Cir. 1982)) (internal quotation marks omitted).

Two sources of law govern motions to disqualify: the local rules of this court and federal common law. *Herrmann*, 199 F. App'x at 752. The court addresses each body of law below.

Local Rule 83.1(f) provides that attorneys appearing before this court are governed by: (1) this court's local rules; (2) the Alabama Rules (to the extent they are not inconsistent with the court's local rules); and (3) the American Bar Association Model Rules of Professional Conduct ("ABA Model Rules") (to the extent they are not inconsistent with either the court's local rules or the Alabama Rules). N.D. Ala. L.R. 83.1(f). The local rules also provide that violations of those standards may result in a variety of sanctions, including "removal from a particular case." *Id.*

Though state-court interpretations of the Rules are not binding on a federal court tasked with determining whether an attorney should be disqualified based on a violation of the Rules, they are persuasive authority concerning the Rules' meaning. *See Clark v. Alfa Ins. Co.*, No. CIV.A. 00-AR-3296-S, 2001 WL 34394281, at *5 n.1 (N.D. Ala. Feb. 7, 2001).

In deciding whether to grant a motion to disqualify, a district court must first "identify a specific rule of professional conduct applicable to that court and determine whether the attorney violated that rule." *Herrmann*, 199 F. App'x at 755; *see also Schlumberger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1561 (11th Cir. 1997) ("[W]here the district court's disqualification order is based on an allegation of ethical violation, ... [t]he court must clearly identify a specific Rule of Professional Conduct which is applicable to the relevant jurisdiction and must conclude that the attorney violated that rule."). A district court "may not disqualify an attorney on the basis of some transcendental code of conduct that existed only in the subjective opinion of the court, of which the attorney had no notice." *Schlumberger*, 113 F.3d at 1561 (cleaned up).

Upon finding a violation of an applicable ethical rule, a district court must then, "considering binding and persuasive federal case law, decide whether or not the ethical lapse warrants disqualification." *Clark*, 2001 WL 34394281, at *3; *see Herrmann*, 199 F. App'x at 747 (affirming disqualification order where district court found violation of Georgia Rule of Professional Conduct); *Clark*, 2001 WL 34394281, at *3 ("Upon [finding a party violated an applicable rule of conduct], the court may then, considering binding and persuasive federal case law, decide whether or not the ethical lapse warrants disqualification."). Even when disqualification may be an appropriate sanction, lesser sanctions may also be appropriate depending upon the circumstances.

### III.    Analysis

L.E. Bell's motion to disqualify requires the court to resolve two distinct issues. First, the court must determine whether Cochran violated a rule of professional conduct applicable in this court by hiring Barker, communicating with him, and continuing to represent a plaintiff despite an alleged conflict of interest. Second, if such a rule violation occurred, the court must decide whether disqualification (or a lesser sanction) is appropriate. As explained below, the court concludes as follows: (1) Cochran violated Rules 4.4(a), 4.4(b), and 5.3(b), but (2) lesser sanctions than disqualification are warranted.

### A.    Cochran's Payment to Barker

Neither party disputes that Cochran paid $5,000 to Barker. What they do dispute, however, is whether that payment (referred to as a "retainer" by Cochran) violated Rule 3.4(b). (Docs. # 116-1 at 44-48, 119 at 30-33). For reasons explained below, the court finds that Cochran's payment to Barker did not violate Rule 3.4(b).

Under Rule 3.4(b), attorneys are prohibited from "offer[ing] an inducement to a witness that is prohibited by law." In other words, the text of the Rule 3.4(b) explicitly permits attorneys to compensate witnesses when permitted by law – only inducements to witnesses prohibited by law are barred by Rule 3.4(b). The Comment to Rule 3.4 sheds some light on how to differentiate between proper and improper payments, stating:

> [i]t is not improper to pay a witness' expenses or to compensate an expert witness on terms permitted by law. The common law rule in most jurisdictions is that it is improper to pay an occurrence witness any fee for testifying and that it is improper to pay an expert witness a contingent fee.

Relevant here, courts have found under similar rules that payments to fact witnesses for the content of their testimony are generally improper[2] and payments to consultants for services rendered are generally proper. *See, e.g.*, *McCarthy Improvement Co*, 2017 WL 443486, at *20 ("Any payment is inappropriate if it is contingent on the content of the witness's testimony."); *Platypus Wear, Inc. v. Horizonte Fabricacao Distribuicao Importacao Exportacao Ltda*, No. 08-20738-CIV, 2010 WL 625356, at *4 (S.D. Fla., Feb. 17, 2010), report and recommendation adopted, 2010 WL 1524691 (S.D. Fla. Apr. 15, 2010) (denying motion for sanctions related to payments made to fact witnesses because the "Court [was] unaware of[] any authority that interprets Rule 4-3.4(b) as barring counsel from compensating someone for their efforts in collecting evidence").

Determining whether Cochran violated Rule 3.4(b) is somewhat complicated by the fact that Barker was both a fact witness and a consultant for Cochran. L.E. Bell asserts that because Barker was a fact witness, any payment "beyond clear incidental expenses" violated Rule 3.4(b). Cochran, however, contends that she did not violate Rule 3.4(b) because the $5,000 she provided to Barker was only "to help her understand the facts and circumstances related to the issues presented by this case, including … technical issues such as Operator Qualification standards, competent person training, and other safety requirements for pipeline workers" as well as to "help[] her [] identify important witnesses and documents, and collect and assemble evidence." (Doc. # 119 at 34). Essentially, L.E. Bell argues the payment was improper because of Barker's status as a fact witness and Cochran counters that the payment was proper because of Barker's status as

---

[2] However, reimbursements for expenses incurred by fact witnesses are generally deemed to fall into the proper category. *See United States v. McCarthy Improvement Co,*, No. 3:14-cv-919, 2017 WL 443486, at *20 (M.D. Fla. Feb. 1, 2017) (quoting *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non–Marine Ass'n*, 865 F. Supp. 1516, 1526 n.11 (S.D. Fla. 1994)) ("Payments to fact witnesses for their actual expenses are permitted; payments 'for the purpose of obtaining their testimony' are not.").

a consultant.

But, the issue of whether the retainer payment was proper is easily resolved because, despite extensive discovery on this issue, L.E. Bell has produced no persuasive evidence that Cochran paid Barker for the content of his testimony. Payments to fact witnesses are only prohibited if those payments are contingent on the content of their testimony. *See, e.g.*, *United States v. McCarthy Improvement Co.*, No. 3:14-cv-919, 2017 WL 443486, at *20 (M.D. Fla. Feb. 1, 2017). Payments to fact witnesses for other reasons, such as reimbursements for expenses, are commonplace and universally permitted. *See id.* (quoting *Golden Door Jewelry Creations, Inc.*, 865 F. Supp. at 1526 n.11) ("Payments to fact witnesses for their actual expenses are permitted; payments 'for the purpose of obtaining their testimony' are not."). Without evidence that Cochran paid Barker for his testimony (instead of for his consulting services), L.E. Bell cannot establish that Cochran violated Rule 3.4(b) or any other Rule.[3] Therefore, the court finds that Cochran's payment to Cochran did not violate Rule 3.4(b) or any other Rule.

### B.    Cochran's Communications with Barker

L.E. Bell next raises a number of theories as to why Cochran's communications with Barker violated various ethical provisions of the Alabama Rules. All of these theories are essentially the same – Cochran violated Rules 4.2(a) and 4.4 by improperly gathering confidential information subject to attorney-client and work-product privilege from Barker.

The court begins with the Rules applicable to Cochran's communications with Barker. Rule 4.2(a) prohibits attorneys from "communicat[ing] about the subject of the representation with a

---

[3] Some courts have found ethical violations can result from payments to fact witnesses for their consulting services. However, these cases involve either ethical rules that differ from Rule 3.4(b) or extenuating circumstances that do not exist in this case. *See, e.g.*, *Rentclub, Inc. v. Transamerica Rental Finance Corp.*, 811 F. Supp. 651, 654-57 (M.D. Fla. 1992) (finding $5,000 consulting payment to fact witness violated Florida Bar Code of Professional Conduct Rules 4-8.4(c) and 4-8.4(d) because, in part, the witness filed a suspicious affidavit only five days after receiving the consulting payment).

person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." The Comment to Rule 4.2 states: "In the case of an organization, Rule [4.2] prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization." Rule 4.4(a) bars attorneys from "us[ing] means that have no substantial purpose other than to embarrass, delay, or burden a third person, or us[ing] methods of obtaining evidence that violate the legal rights of such a person." Lastly, Rule 4.4(b) requires any "lawyer who receives a document that on its face appears to be subject to the attorney-client privilege or otherwise confidential[] and who knows or reasonably should know that the document was inadvertently sent [to] should promptly notify the sender" and take additional action.

L.E. Bell asserts that Cochran violated Rules 4.2(a) and 4.4(a) by obtaining confidential information from Barker. (Doc. # 116-1 at 17-20). However, the parties note the trend that modern courts, relying on commentary by the American Bar Association, have held that only Rule 4.4(a), and not Rule 4.2(a), prohibits parties from obtaining from former employees information protected by attorney-client privilege or work-product privilege. (Docs. # 116-1 at 17-18, # 119 at 20-21).[4] For that reason, the court evaluates L.E. Bell's attorney-client and work-product privilege arguments under Rule 4.4(a).

The text of Rule 4.4(a) does not include any test to determine if the Rule has been violated. In the absence of a clear test, various courts have interpreted similar professional rules in slightly different ways. *See, e.g.*, *Martinez v. County of Antelope*, No. 4:15CV3064, 2016 WL 324824, at

---

[4] The Alabama Supreme Court has also held that Rule 4.2(a) applies only to current employees. *See Ex parte Terminix Int'l, Co., LP*, 2020 WL 6372900, at *3-4 (Ala. Oct. 30, 2020). Because Barker is a former employee of L.E. Bell and not a current employee, that case law suggests another reason why L.E. Bell's attorney-client and work-product privilege arguments may proceed only under Rule 4.4(a). At the time of the communications, Barker's employment had already been terminated by L.E. Bell.

*9 (D. Neb. June 13, 2016) (applying a four-part test for disqualification). However, these tests essentially impose similar ethical responsibilities on counsel: duty of due care. *See Calise v. Brady Sullivan Harris Mills, LLC*, No. 18-9WES, 2019 WL 1397245, at *9 (D.R.I. Mar. 28, 2019) (concluding a similar rule imposes "an affirmative duty to proceed with due care"). In other words, an attorney who accidentally solicits confidential materials from a party opponent may avoid violating Rule 4.4(a) only if she shows she obtained those materials despite acting with due care.

      i.      **L.E. Bell has not shown that Cochran violated Rule 4.4(a) by obtaining confidential information subject to attorney-client privilege.**

L.E. Bell has presented only circumstantial evidence that Cochran violated Rule 4.4(a) by obtaining information protected by attorney-client privilege from Barker. L.E. Bell points to Barker's involvement with L.E. Bell's litigation team and subsequent communications with Cochran as purported proof that Cochran obtained information from Barker that is protected by attorney-client privilege. However, this evidence fails to satisfy the applicable standard – the burden is on L.E. Bell, as the party seeking disqualification, to prove that Cochran improperly obtained information subject to attorney-client privilege.[5] *See In re BellSouth Corp.*, 334 F.3d at 961. And, despite engaging in extensive discovery, including a deposition of Barker supervised by the court, L.E. Bell has not presented the court with any evidence (much less sufficient evidence) that Barker shared communications with Cochran that were protected by attorney-client privilege.

      ii.      **L.E. Bell has shown that Cochran violated Rules 4.4(a) and 4.4(b) by obtaining confidential information subject to work-product privilege.**

L.E. Bell next asserts that Cochran violated Rules 4.4(a) and 4.4(b) by gathering information from Barker that was protected by work-product privilege. Specifically, L.E. Bell asserts Cochran violated Rule 4.4(a) by obtaining L.E. Bell's proximate cause theories from Barker

_____

[5] Furthermore, the evidence that does exist tilts the other way. For example, Barker testified that he "would not have told [] Cochran … [] what [an attorney for L.E. Bell] said at any point." (Doc. # 116-15 at 187:25-188-2).

11

and Rule 4.4(b) by obtaining a marked-up draft of an NTSB report from Barker.

Under the most common iteration of the work-product privilege doctrine, documents are protected if those documents are prepared by an attorney in anticipation of litigation and reveal that attorney's mental impressions or legal theories. *See Hickman v. Taylor*, 329 U.S. 495, 511-12 (1947); Fed. R. Civ. P. 26(b)(3). However, the doctrine also protects intangible work product, such as legal strategies, and extends to work product created by non-attorneys at the direction of an attorney. *See* 8 Wright & Miller, *Fed. Prac. & Proc. Civ.* § 2024 (3d ed. 2010) (stating that despite the text of Rule 26(b)(3), the work-product privilege doctrine "continues to furnish protection for work product within its definition that is not embodied in tangible form"); *United States v. Nobles*, 422 U.S. 225, at 238-39 (1975) ("It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself." (footnote omitted)).

L.E. Bell asserts that the proximate cause theories relayed by Barker to Cochran involved intangible work product created by Barker and other non-attorney consultants at the direction of the L.E. Bell legal team and that, by learning these proximate cause theories, Cochran violated Rule 4.4(a). (Doc. # 116-1 at 13). Because these causation theories were developed by non-attorney representatives at the direction of L.E. Bell's counsel, these theories are entitled to work-product privilege.[6] And, because Cochran learned from Barker of proximate cause theories that were protected by work-product privilege, whether Cochran violated Rule 4.4(a) depends on whether she acted with due care. *See Calise*, 2019 WL 1397245, at *9. A review of the record shows that she did not.

---

[6] Because L.E. Bell asserts these theories were developed as a result of Barker's coordination with counsel (Doc. # 116-1 at 13), some of the causation theories at issue may also be entitled to work-product privilege on the grounds that L.E. Bell's counsel played a role in developing those theories.

When working with a non-attorney who may possess privileged information, Rule 4.4(a) imposes a duty on attorneys to tread carefully. Attorneys are expected to take concrete acts to prevent and/or remedy any exposure to privileged information. For example, attorneys may provide notice to opposing counsel or the court that they are working with a witness or consultant who may have privileged information, advise non-attorney witnesses and consultants that privileged information should not be shared, and, in the event that potentially confidential information is shared, promptly advise opposing counsel to ensure that the opposing party's privilege is preserved. *See Martinez*, 2016 WL 3248241, at *9 (describing factors applied by other courts when evaluating disqualification motions under analogous rules); *Calise*, 2019 WL 1397245, at *6 (finding that analogous rules require attorney who communicate with former employees of a party-opponent to take affirmative actions to ensure that privileged communications are not shared); *Arnold v. Cargill Inc.*, No. 01-2086 (DWF/AJB), 2004 WL 2203410, at *7-8 (D. Minn. Sept. 24, 2004) (holding that before communicating with a former employee of an adverse party, attorneys have an affirmative duty to advise the former employee that he cannot disclose privileged communications).

The record indicates that Cochran was aware that Barker had some involvement with L.E. Bell's legal team. Despite that knowledge, she did very little to prevent Barker from sharing privileged information. Barker testified that at no point during the 14 hours of telephone conversations or the three in-person meetings did Cochran inform him that some of his communications with L.E. Bell's attorneys may be subject to work-product privilege.[7] (Doc. # 116-15 at 112:14-112:16). Nor did Cochran advise L.E. Bell that she was retaining Barker or discussing causation theories with him that could touch on the consulting work he performed for

---

[7] Cochran does claim, however, that she sought to protect L.E. Bell's assertions of attorney-client privilege by telling Barker to not tell her anything that L.E. Bell's counsel had said in his presence. (Doc. # 119 at 7).

L.E. Bell. In fact, L.E. Bell discovered Barker's working relationship with Cochran only after Barker called an attorney for L.E. Bell to vent his frustrations at how much Cochran had been contacting him. (Doc. # 116-1 at 15). Based on these facts, the court concludes that Cochran failed to act with due care with respect to the work-product privilege doctrine and, therefore, violated Rule 4.4(a).

Furthermore, the record indicates that Cochran also violated Rule 4.4(b). According to Cochran, without prompting, Barker provided her with a copy of an NTSB report that was highlighted and contained several handwritten annotations. (Doc. # 119 at 39). The handwritten notes referred to one of the victims by name and to the state of the pipeline. (Doc. # 119 at 40). Cochran assumed the annotations made to the NTSB draft report were made by Barker, and she saved a copy of that report. (Doc. # 119 at 40). However, Cochran's assumption proved to be incorrect – the highlighting and annotations were made by L.E. Bell's employees at the direction of L.E. Bell's counsel as part of the company's efforts to determine causation and liability. (Doc. # 94-1 ¶ 35).

L.E. Bell does not claim that the NTSB draft report itself is subject to work-product privilege. Rather, L.E. Bell asserts that the highlighting and annotations made to the NTSB draft report are subject to work-product privilege. And, case law supports L.E. Bell's assertion. Even if a document itself is not privileged, attaching a note to the document or highlighting portions of it can give rise to viable claims of work product privilege. *See F.D.I.C. v. Singh*, 140 F.R.D. 252, 254 (D. Me. 1992) ("Although [Plaintiff's attorney]'s attached notes and highlighting on the memorandum itself are not subject to discovery, the memorandum is."); *Biben v. Card*, 119 F.R.D. 421, 429 n.4 (W.D. Mo. 1987) ("Any notations, highlighting, etc., made by counsel [on otherwise discoverable documents] would be protected from discovery by the attorney work-product rule.").

A review of the marked-up NTSB draft report shows that at least some of the markings fall under work-product privilege. In particular, L.E. Bell points to an annotation in the draft report indicating its intention to investigate ▮▮▮▮▮▮▮▮▮. (Doc. # 120-1 at 20). The court agrees with L.E. Bell that the annotation is protected by work-product privilege because the annotation references a legal theory developed or noted by L.E. Bell in preparation of litigation. Courts have held that similar decisions by counsel to test legal theories are protected by work-product privilege. *See, e.g.*, *Shoemaker v. Gen. Motors Corp.*, 154 F.R.D. 235, 236 (W.D. Mo. 1994) ("The decision of what to test and how is essentially a working-out of the defendant's interpretation of facts and testing of its defenses [and is] protected.").

Because the marked-up NTSB report is protected by work-product privilege and Cochran failed to take any sort of remedial action, whether she violated Rule 4.4(b) hinges on whether the marked-up NTSB report "appears to be subject to the attorney-client privilege or otherwise confidential." Based on the record, the court concludes the document meets that standard. The circumstances surrounding Cochran's receipt of the marked-up NTSB report would have placed a reasonable attorney on notice that the highlighting and annotations on the face of the document could have been prepared in anticipation of litigation and therefore **are** subject to work-product privilege. Cochran received the marked-up report in June 2018, roughly six months after the first suit arising out of the pipeline explosion was filed. *See Webster v. Colonial Pipeline Co.*, Case No. 58-CV-2017-901175, Circuit Court of Shelby County, Ala.[8] L.E. Bell was a defendant in that suit. *Id.* A reasonable attorney who received a marked-up legal document related to ongoing litigation

---

[8] Puzzlingly, L.E. Bell claims that "Cochran filed her original complaint against Colonial on July 9, 2018, three weeks after she met with Barker and was provided the draft NTSB report containing L.E. Bell's highlighting and annotations." (Doc. # 39). But the complaint referenced by L.E. Bell was not filed until June 2019. *See Delaughder v. Colonial Pipeline Co.*, 2-19-cv-923 (N.D. Ala).

from a former consultant for a party involved in that litigation should suspect that marked-up document may be protected by work-product privilege. Thus, the court finds Cochran violated Rule 4.4(b) when she failed to take appropriate action after Barker provided her with a document that, on its face, contained annotations protected by work-product privilege.

### C.     Cochran's Potential Conflict of Interest

Lastly, L.E. Bell asserts that Cochran violated Rule 5.3(b) by retaining Barker. Under Rule 5.3(b), a lawyer who has "direct supervision" over a nonlawyer must make "reasonable efforts to ensure that the [nonlawyer]'s conduct is compatible with the professional obligations of the lawyer." In other words, Rule 5.3(b) requires lawyers to ensure that nonlawyers under their supervision comply with the Rules. According to L.E. Bell, Cochran violated Rule 5.3(b) by failing to ensure that Barker complied with Rule 1.9, which governs conflicts of interests. Under Rule 1.9(a), the provision relevant here, a lawyer who has formally represented a client may not "[r]epresent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client, unless the former client consents after consultation."[9] And, L.E. Bell claims that Barker, through his work on the L.E. Bell legal team, was "automatically" conflicted out of assisting Cochran with any claims against L.E. Bell.

But, L.E. Bell's legal theory glazes over part of the conflicts of interest analysis that is central to Rule 1.9(a). As the Comment to Rule 1.9 observes, the question underlying Rule 1.9(a) "is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question." So, a conflict of interest exists in this context only if a lawyer's involvement (or, as here, a non-lawyer's involvement) in a prior

_____

[9] If such a conflict of interest existed for one attorney under Rule 1.9(a), Rule 1.10(a) would impute that conflict to the attorneys at the same firm.

16

matter was so extensive and/or direct that subsequent representation in similar matters must be barred to protect the former client or clients. Courts interpreting Rule 1.9(a) and similar rules in other jurisdictions have repeatedly held that attorneys and non-attorneys are not barred from subsequent, similar matters if their involvement in the former matter was not so extensive or direct as to reveal confidential information. *See Ex parte Terminix Int'l, Co., LP*, 2020 WL 6372900, at *4-6 (Ala. Oct. 30, 2020) (finding that law firm did not violate Rule 1.9(a) by hiring a former employee of defendants because that former employee's involvement in legal matters was "limited"); *Herrmann*, 199 Fed. App'x at 753 (citing *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1029 (5th Cir. Unit B 1981)) (stating that to show a violation of Georgia's conflicts of interests rule, the moving party "must demonstrate that the attorney 'has knowledge of the particular practices and procedures which are the subject matter of [the] suit'"); *Zimmerman v. Mahaska Bottling Co.*, 19 P.3d 784, 822 (Kan. 2001) ("A firm may avoid disqualification if [] the nonlawyer employee has not acquired material and confidential information regarding the litigation.").

A review of the record shows that although Barker's involvement with the L.E. Bell legal team was not so substantial as to disqualify him from assisting Cochran, his involvement was so direct as to prohibit him from consulting for Cochran.[10] As noted above, Barker's involvement with the L.E. Bell legal team was limited to gathering and analyzing facts later provided to OSHA and NTSB investigations and developing theories of what caused the explosion and who might be legally responsible. And, it is Barker's involvement in developing causation and liability theories

---

[10] Cochran describes L.E. Bell's work for her as "side-switching" and correctly notes that no per se rule exists prohibiting experts from switching sides. (Doc. # 119 at 35-36). Although there may not be a blanket rule against side-switching, *see Industrial Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1445 (11th Cir. 1998) ("In the absence of any precedent, we decline to recognize any blanket rule or policy against [experts] 'side-switching.'"), there are ethical rules implicated when experts with access to confidential information later switch sides.

for L.E. Bell that exposed him to confidential information protected by work-product privilege. Because of that exposure, Rule 1.9(a) therefore prohibits Barker from assisting Cochran.

Whether Cochran violated Rule 5.3(b) turns on whether she made "reasonable efforts" to ensure that Barker was not violating Rule 1.9(a) or any other Rule by working for her as a consultant. But, Cochran has provided little to no evidence that she made such efforts. The record provides no indication that Cochran told Barker that he might have had privileged communications with L.E. Bell or that she advised L.E. Bell that she was hiring a former member of L.E. Bell's legal team. Cochran testified that she asked Barker early on in their business relationship about the extent of his work with L.E. Bell's legal team and, after Barker said he did not work directly with L.E. Bell's lawyers, she told Barker not to tell her anything that L.E. Bell's counsel had said in his presence. (Doc. # 119 at 7). But, taking Cochran's testimony at face value, that testimony actually works against her. If Cochran was so concerned that Barker had access to confidential information that she felt the need to tell him not to relay to her any conversations that he had with L.E. Bell's lawyers (presumably because those conversations contained privileged information), why did Cochran continue to use Barker as a consultant without taking any additional, appropriate precautions? And, why did Cochran wait to ask Barker about his relationship with L.E. Bell's legal team until after she began using him as a consultant? The record indicates that despite being placed on notice of Barker's role with L.E. Bell's legal team, Cochran took few, if any precautions. Thus, the court finds Cochran failed to take "reasonable efforts" and therefore violated Rule 5.3(b). *See Grant Heilman Photography, Inc. v. McGraw-Hill Global Education Holdings, LLC*, No. 17-694, 2018 WL 2065060, at *9 (E.D. Pa. May 2, 2018) (finding that defendant violated a similar rule by hiring a former employee of the plaintiff who had potentially been exposed to "confidential and privileged information").

###### D.     Determining Appropriate Sanctions

As described more thoroughly above, Cochran violated Rules 4.4(a), 4.4(b), and 5.3(b).[11] The only remaining issue is to determine appropriate sanctions.

L.E. Bell requests a slate of sanctions up to, and including, disqualification. (Doc. # 116-1 at 50). As other courts have acknowledged, "violations come in varying degrees of severity, but disqualification is always a drastic measure, which courts should hesitate to impose except when absolutely necessary." *Nuri v. PRC, Inc.*, 5 F.Supp.2d 1299, 1304 (M.D. Ala. 1998) (citations omitted). For violations short of disqualification, courts have found that other sanctions "like exclusion of ill-gotten evidence … should be used when appropriate." *Id.*[12]

Courts considering similar claims have taken into account a number of factors when determining appropriate sanctions, including whether the ethical violations were the result of intentional or merely negligent actions, whether the confidential information obtained was prejudicial,[13] and whether the attorney who obtained the confidential information promptly advised opposing counsel. *See Martinez*, 2016 WL 324824, at *9 (applying a four-part test for disqualification); *Nuri*, 5 F.Supp.2d at 1305 (concluding disqualification was inappropriate because, in part, defendant failed to show prejudice).

---

[11] L.E. Bell also briefly asserts that Cochran violated Rules 4.3, 8.4(a), and 8.4(b) but provides virtually no briefing on why Cochran violated these Rules. (Doc. # 116-1 at 8). Because of L.E. Bell's cursory briefing on these Rules, the court deems these arguments abandoned. But, even if these arguments were not waived, the court's sanctions of Cochran would remain the same. These Rules partially overlap with the Rules that L.E. Bell has shown Cochran violated. And, the court's analysis of which sanctions to apply hinges not on the number of Rules that Cochran violated, but rather the nature and extent of the underlying conduct.

[12] Some federal courts have held that counsel should be automatically disqualified for violating certain rules, such as conflict-of-interest rules. *See Southern Visions, LLP v. Red Diamond, Inc.*, 370 F.Supp.3d 1314, 1335-36 (N.D. Ala. 2019) (listing cases holding that disqualification should be automatic in the event counsel violates conflict-of-interest rules). However, Cochran's Rule violations arise out of a unique situation for which automatic disqualification, an extreme measure, is unsuited.

[13] L.E. Bell argues that whether it suffered prejudice is irrelevant and, in the alternative, that receipt of privileged information is per se prejudicial. (Doc. # 120-1 at 5). But, the overwhelming majority of courts, including courts within this circuit, have looked to whether a party allegedly incurred prejudice when determining appropriate sanctions for an ethical violation. *Nuri*, 5 F.Supp.2d at 1305.

Although Cochran violated Rules 4.4(a), 4.4(b), and 5.3(b), her ethical violations are not so severe as to warrant disqualification.[14] Cochran violated those Rules by receiving confidential work product from Barker and not taking remedial steps to remedy that receipt as well as by hiring Barker as a consultant without taking "reasonable efforts" to ensure that relationship conformed to the ethical obligations of the profession. In both instances, Cochran violated the Rules and obtained confidential work product without advising L.E. Bell. But, it appears to the court that those ethical violations resulted from Cochran believing (incorrectly) that Barker's role with regard to L.E. Bell's litigation team was virtually nonexistent. Cochran testified that Barker never told her that he was privy to L.E. Bell's legal strategy or that he was part of L.E. Bell's legal team. (Doc. # 119-2 ¶ 25-26). And, Cochran testified that she took some steps to ensure that she did not learn confidential information from Barker, including by expressly telling him not to tell her anything that L.E. Bell's lawyers had said in his presence. (Doc. # 119-2 ¶ 25-26). Such measures were clearly insufficient here, particularly with respect to information covered by work-product privilege – but those measures evidence an intent to abide by the Rules and not an intent to harm L.E. Bell or any other party to this litigation. Relatedly, the court notes that Cochran has no pending claims against L.E. Bell other than those raised in the no-fault worker's compensation case pending in state court. Although Cochran obtained work product from another party to the litigation, that work product was not that of an adverse party. So, to the extent that Cochran violated the Rules, she did so by failing to investigate Barker's knowledge of confidential information despite being placed on notice that Barker might have had such knowledge (or, with respect to the draft NTSB report, physical documents protected by work-product privilege). This is a case where Cochran

---

[14] Furthermore, it is important to note that although the consolidated federal cases are being coordinated with the state court, this court cannot disqualify Cochran from the state court cases, as L.E. Bell seems to request. (Doc. # 116-1 at 50).

acted without due care, but not willfully or maliciously.

Furthermore, any prejudice incurred to L.E. Bell by the disclosures is minimal at most. L.E. Bell asserts that it suffered prejudice because Barker played a role in developing legal theories of causation that may shift liability to Colonial and that Cochran may now be able to "confirm" L.E. Bell's theories of causation. (Docs. # 116-1 at 13, 120-1 at 1). In other words, L.E. Bell claims it has suffered harm because Cochran may be able to better predict its litigation strategy. But, this argument relies on the assumption that Barker's theories of causation and the theory of causation referenced in the NTSB draft report are in some way indicative of L.E. Bell's trial strategy.[15] That assumption does not hold water. Cochran obtained, at most, information related to causation theories developed by L.E. Bell employees and consultants at the direction of L.E. Bell. That information was privileged. *See Nobles*, 422 U.S. at 238-39. But, that information was also incomplete and not yet incorporated into a trial strategy by L.E. Bell's counsel. Divining L.E. Bell's trial strategy out of snippets of work product developed by non-attorneys is akin to a football coach trying to divine another team's game-day strategy out of one leaked play. It just would not work.

However, Cochran's conduct falls short of the ethical guidelines set for the legal profession. When Cochran hired Barker, she was evidently aware that Barker could possess confidential information. And, although she took steps to prevent Barker from sharing information protected by attorney-client privilege, she took few steps, if any, to prevent him from sharing information protected by work-product privilege. Because of that failure, this litigation has been delayed and imposed extensive costs on the other parties. Lesser sanctions are therefore warranted.

---

[15] L.E. Bell also appears to assert that it may suffer prejudice if Colonial became aware of these theories of liability. (Doc. # 120-1 at 1). But, the court finds it improbable that Cochran would "leak" such information to Colonial, an adverse party. *See Delaughder v. Colonial Pipeline Co.*, 19-cv-923 (N.D. Ala.). To the extent that such a leak could occur, disqualifying Cochran would not prevent it from occurring.

IV.     **Conclusion**

Accordingly, L.E. Bell's Amended Motion to Disqualify Counsel and for Related Sanctions. (Doc. # 116-1) is due to be granted in part and denied in part. A separate order will be entered.

**DONE** and **ORDERED** this February 24, 2021.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE